**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF COLORADO**

Criminal Case No. 12-cr-00140-CMA

UNITED STATES OF AMERICA,

                Plaintiff,

v.

1.     MICHAEL DESTRY WILLIAMS,

                Defendant.

---

### GOVERNMENT'S SENTENCING STATEMENT

---

The United States of America (the government), by and through Kenneth M. Harmon, Assistant United States Attorney for the District of Colorado, submits the following sentencing statement:

## I.  INTRODUCTION

The defendant was charged by way of superseding indictment with three counts of tax evasion, in violation of Title 26, United States Code, Section 7201(Counts 1-3); one count of structuring transactions to evade currency reporting requirements, in violation of Title 31, United States Code, Section 5324(a)(3) (Count 4); two counts of bank fraud, in violation of Title 18, United States Code, Section 1344 (Counts 5-6); three counts of passing fictitious financial instruments or obligations, in violation of Title 18, United States Code, Section 514 (Counts 7-9); and one count of corruptly interfering with the administration of the internal revenue laws, in violation of Title 26, United States Code, Section 7212(a)(Count 10).

The defendant was tried before a jury, with trial commencing on October 28, 2013 and

concluding on November 5, 2013.  The jury returned guilty verdicts on all ten counts of the superseding indictment.

## II.   <u>STATUTORY PENALTIES</u>

The maximum statutory penalty for the tax evasion offenses set forth in the superseding indictment is, per count: not more than five (5) years imprisonment; not more than a $250,000 fine, or both, together with the costs of prosecution; a supervised release term of not more than three (3) years; and a $100 special assessment fee.

The maximum statutory penalty for the structuring offense set forth in the superseding indictment is: not more than five (5) years imprisonment; not more than a $250,000 fine, or both; a supervised release term of not more than three (3) years; and a $100 special assessment fee.

The maximum statutory penalty for the bank fraud offenses set forth in the superseding indictment is, per count: not more than thirty (30) years imprisonment; not more than a $1,000,000 fine, or both; a supervised release term of not more than five (5) years; and a $100 special assessment fee; plus restitution.

The maximum statutory penalty for the fictitious obligations and instruments offenses set forth in the superseding indictment corresponds with the penalties prescribed by Title 18, United States Code for Class B felonies generally. *See* 18 U.S.C. §514(a).   Class B felony offenses carry a maximum imprisonment term of twenty five (25) years imprisonment, per count. 18 U.S.C. §§3559(a)(2), 3581(b)(2). The maximum fine is not more than $250,000, per count. The maximum supervised release term is not more than five (5) years. There is a $100 special assessment fee, per count.   Restitution applies.

The maximum statutory penalty for corruptly interfering with the administration of the internal revenue laws is: not more than three (3) years imprisonment; not more than a $250,000

fine, or both; a supervised release term of not more than one (1) year; and a $100 special assessment fee.

### III.   FACTS RELEVANT TO SENTENCING

The evidence at trial establishes that the conduct relevant to the offenses (§1B1.3) began in or about in or about March 2003, but no later than September 2003.  The evidence at trial, together with evidence the government was prepared to show, also establishes the following:[1]

**Background.**

During the times material to this case, the defendant, age 49, was a resident of Pueblo County, Colorado. He was self-employed as a general contractor focusing primarily on residential construction projects, including roofing, remodeling and the repair and restoration of residential structures sustaining fire and water related damage. Much of this contractor work was covered by insurance, and the defendant would often receive payment on his work through insurance companies.  The defendant was also self-employed as a real estate investor involved in the purchase, renovation and resale (commonly known, as "fixing and flipping") of residential properties.  As part of this business, the defendant would often temporarily lease out the renovated residences pending their resale.

The defendant operated his general contractor construction business principally (but not exclusively) through Greenview Construction, Inc. (hereinafter, "Greenview"), a Colorado corporation that he beneficially owned and whose operations, as its sole officer in fact, he oversaw

---

[1]      Unless otherwise indicated, the following factual recitation is drawn from the testimony and exhibits admitted at trial.   The government was also prepared to present additional evidence at trial that was described and was the subject of three separate Federal Rule of Evidence 404(b) notice (Docket Entries 34, 68, 74).   Much of the unintroduced evidence described in these notices is relevant, in the government's view, either to a proper calculation the defendant's advisory sentencing guideline, or otherwise is material in connection with the Court's extra-guideline consideration of the statutorily mandated   factors (18 U.S.C. §3553(a)), or both.

and controlled.   Over the years, the defendant had several employees who assisted him in the office management and bookkeeping of Greenview.   He primarily conducted the field work of Greenview through a network of independent subcontractors.   He operated the business out of a home office within two principal residences that he maintained over the years, the first located at 1806 E. 8th Street, Pueblo, Colorado and second at 1735 Cortner Road, Pueblo, Colorado.

The defendant primarily operated his real estate investment business through M.D. Williams, Inc. (hereinafter, "MDW, Inc.") and M.D. Williams Enterprises, Inc. (hereinafter, "MDWE"), its successor, which entities the defendant formed and beneficially owned.   Although the defendant, at times, had partners on particular real estate projects that he pursued through this business, the defendant conducted the overall business alone; he was the *de facto* sole officer of these corporations and oversaw and controlled all aspects of their operations.   The defendant typically used the office employees he hired for Greenview to assist him in the same capacity with his real estate investment business; he did not otherwise have a separate staff of employees for this business.   He operated this business as well out of home offices that he maintained in his principal residences.

**Defendant's Investment in CHIP.**

In or about January 2003, the defendant invested $150,000 in a private real estate investment pool based in Pueblo, Colorado and operated through and under the Colorado Housing & Investment Program, L.L.C. (hereinafter, "CHIP"), a Colorado limited liability company formed to conduct the investment pool.   The real estate investment pool consisted of a small group of individual investors who pooled their funds and extended short term construction financing and bridge loans for residential real estate construction projects.   Because of legal considerations, the promoters and organizers of the pool focused on having individuals as members, and the

4

defendant, when he signed his investment subscription and related documents to join the real estate investment pool, invested in an individual capacity.

CHIP began its operations in early 2003 and continued until early 2008.   CHIP's primary source of income, over this time, was the interest that it charged on its construction financing and bridge loans.   Throughout its life, CHIP made quarterly distributions of funds to its members. These distributions consisted of members' *pro rata* portion of CHIP's profits for the given quarter and included the interest that CHIP was paid on is lending activity. Based on his $150,000 investment, the defendant had a 20%'s share of the investment pool and accordingly received 20% of CHIP's profits. The real estate investment pool was significantly profitable throughout its life. Following the close of each of its years of operation, CHIP reported the payments that it made to its members, including members' individual shares of its income, both to its members and the Internal Revenue Service (hereinafter, "IRS") on an annual basis in IRS Schedules K-1 that were prepared and issued in connection with CHIP's annual federal income tax returns. The defendant received these IRS Schedules K-1 for all five years of its operation.

In or about February 2008, at the end of the real estate investment pool, the defendant received a check returning his original $150,000 principal in the investment.

**The Defendant's Federal Taxpayer Record.**

Over the years leading up to 2001, the defendant sporadically filed federal income tax returns for himself and his businesses.   In or about January 2001, the defendant belatedly filed federal individual income tax returns for himself on IRS Forms 1040 for the years 1997 and 1998, paying with the filing of the returns the amounts of federal income and self-employment taxes he claimed to owe for those years.   In or about June 2001, the defendant belatedly filed an IRS Form 1040 individual income tax return for himself and an IRS Form 1120 corporate income tax return

for Greenview for tax year 1999.   The returns, prepared by a paid tax accountant who testified at

trial (identified herein as "TC"), reported no income tax liability for Greenview but that the

defendant personally owed $3,722 in federal income and self-employment taxes for the year.   The

defendant inexplicably failed to sign the individual income tax year and tendered no payment with

the return.

The IRS ultimately determined to accept the defendant's 1999 individual income tax return

for filing and assessed him the amount in federal income taxes he reported owing in the return,

together with interest and tax penalties associated with failing to timely file his return and pay

these taxes.   IRS notices to the defendant concerning these assessments and seeking payment of

the assessed amounts were largely ignored by the defendant.   In or about May 2002, the IRS

issued notices indicating its intent to seek involuntary collection of the assessed amounts through

issuing liens and levies.   As part of the process, the IRS recorded a federal tax lien with the Pueblo

County Clerk and Recorder providing notice that the defendant, by that point, owed the IRS

$5,561.32 with respect to his 1999 federal tax liabilities.

### Defendant's Sale of 910 Cherry Lane, Pueblo, CO And His Efforts to Avoid the 1999 Federal Tax Lien.

In or about August 2003, the defendant and an occasional real estate investment partner

contracted to sell a residential property located at 910 Cherry Lane, Pueblo, Colorado which they

had held together as an investment property.   In or about late September 2003, during the process

of checking title on the property and preparing closing documents, the title company's principal

closer on the transaction (identified herein as "DG"), noticed that the name under which defendant

held his interest in title to the property ("Will Williams") did not match the name for the defendant

on his drivers' license. She ran a public records check under the latter name and discovered the

defendant's 1999 federal tax lien. She confronted the defendant with the lien.   The defendant

initially claimed that the tax lien was not associated with him.   He then acknowledged that the lien

did, in fact, concern him but maintained that it was no longer valid; he pointed DG to a purported

UCC filing that had been made with the Pueblo Clerk and Recorder's Office that he claimed had

satisfied and released the federal tax lien.

When the title company employees retrieved and reviewed the filing, however, they

learned that it was simply a UCC Financing Statement, apparently prepared and filed by the

defendant, which purported to terminate the federal tax lien and so was not valid. The defendant's

protestations notwithstanding, the title company decided to withhold and escrow from the

defendant's share of the seller's proceeds funds sufficient to satisfy the defendant's 1999 federal

tax lien.   On or about November 25, 2003, after direct communications with the IRS, the title

company paid over $6,993.91 of the escrowed funds to the IRS satisfying the tax lien and the

defendant's federal tax liability for the 1999 year.

**The Defendant's Subsequent Tax Filing Record.**

Follow this involuntary payment of his 1999 federal taxes, the defendant completely

stopped filing individual federal income tax returns.[2]   The last individual income tax return

---

[2]      The defendant continued, for a time, intermittently to file federal corporate income tax returns for his two
businesses, however.   As further discussed below, the defendant engaged TC to prepare 2003 corporate returns for
Greenview and MDW, Inc., which he caused to be filed with the IRS in April and August 2005.   He engaged another
tax preparer (identified herein as "JG") in late November 2007 to prepare the 2004, 2005 and 2006 corporate returns
for Greenview and the 2005 and 2006 corporate returns for MDWE.   These returns were filed with the IRS over the
course of December 2007 and January 2008.

None of the returns reported taxable income or taxable income for either of the defendant's businesses for
these years.

received by the IRS for the defendant was for the 1999 year in 2001.[3]  Beginning in or about March

2004, instead of filing federal income tax returns on recognized IRS forms for a particular tax year,

the defendant started recording with the Pueblo County Clerk and Recorder's Office letters to the

IRS which he styled as "Filing Statement(s) … In Affidavit Form."   In these letters, the defendant

declared that he did not believe that he was legally liable for federal income taxes and was not

subject to the federal income tax filing requirements.   The defendant stated in these submissions

that his filing statements were being submitted to the IRS in lieu of returns filed on IRS Forms

1040 and that they satisfied any filing requirement to which he might be subject under the internal

revenue laws.   Each March thereafter, and continuing at least through March 2008, the defendant

recorded substantially the same "filing statement" with the Pueblo County Clerk and Recorders

Office with respect to the immediately preceding tax year. The letters addressed the defendant's

tax years 2003 through 2007.[4]

Beginning in or about 2004 as well, the defendant started expressing to various of his

employees, subcontractors and business associates the view that he that the federal internal

revenue laws were unconstitutional and otherwise invalid and did not apply to him.   He also

---

[3]     Although he did not file individual federal income returns for any years past 1999, the defendant provided
Sunflower Bank, in connection with applying for a $216,000 home equity line of credit in July 2002, purported file
copies individual federal income tax returns for himself for tax years 2000 and 2001.   He also submitted, in
connection with this line of credit, corporate income tax returns for Greenview for the same years.

The returns were purportedly prepared by TC and indicated that the defendant had personal total income of
$8,091 in 2000 and $22,101 in 2001, while Greeenview had total income of $98,935 and $100,452, respectively, for
these years.   While the purported file copies of the returns reported Greenview as paying no taxes for these years, they
showed the defendant making estimated personal tax payments of $1,200 and $4,200 in 2000 and 2001 respectively.
Official IRS records show no tax payments for the defendant for either of these years, however.

In his line of credit application, the defendant represented to the bank that he made $4,000 per month in gross
income from Greenview.

[4]     These purported "filing statements" were marked as government trial exhibits but not offered during the trial.
They appear as Government Exhibits ("GX") 301 through 305.

8

started holding himself out to be a member of an organization called the "Pembina Nation, Little

Shell Band of North America," which he described to various of his associates as a Native

American tribe not subject to the laws of the federal government generally and the federal internal

revenue laws in particular. The defendant asserted, in particular, that his membership in this

organization exempted him from federal taxation.   Over time, the defendant began making these

and other similar assertions as part of broader pronouncements expressing the view that he was a

"sovereign citizen" who was not subject to the jurisdiction and authority of the federal government

generally.

**The Defendant's Tax Evasion Conduct (Counts 1-3).**

The defendant's efforts to avoid his federal tax obligations transcended simply his failure

to file individual federal income tax returns for any tax years after 1999.   Although he continued

to draw money from his businesses that constituted income to him, the defendant made no further

payments of income or self-employment taxes to the IRS after the forced collection of his 1999

federal taxes in 2003. Nor did he have either of his businesses issue to him or file with the IRS

informational returns, either on Forms W-2 or 1099, notifying the IRS of the money he was taking

from the businesses.   The defendant also undertook a number of affirmative acts to attempt to

conceal his income from the IRS and to make it difficult for the IRS to determine his true federal

tax liabilities for the years after 2003.   This conduct, which was largely described at trial, is

summarized below.

**The Defendant's Efforts to Change the Tax Reporting on his CHIP Investment.**

In or about early 2004, as CHIP's accountants were undertaking to prepare CHIP's federal

partnership return and issue its investors IRS Schedules K-1 for its first year of operation, the

defendant advised CHIP's manager (hereinafter identified as "SMC") and his staff that he did not

want his CHIP investment reported to the IRS under his social security number ("SSN") but instead wanted to use the name of his business, M.D. Williams, Inc., and an employer identification number ("EIN") assigned to it, for tax reporting purposes. The defendant, by way of justification, explained to SMC, at some point, that he did not believe that individual federal income taxes were constitutional or lawful and that he accordingly did not believe that he had an obligation to pay them.

After consulting with CHIP's accountants and legal counsel, SMC advised the defendant that they could not accommodate the defendant's request and that, consistent with the original intent of the investment, CHIP's Schedules K-1 to the defendant would identify him as an individual investor by his social security number and that the investment would be reported to the IRS on this basis and with his personal taxpayer identification. As a consequence, for each of its years of operation, CHIP's returns and Schedules K-1 for the defendant consistently reported his investment results to the IRS under his name and his SSN.   The defendant protested this decision and each year complained to SMC, his staff and CHIP's accountants about the way his CHIP investment was being reported to the IRS.

At some point, in an effort to placate the defendant, SMC agreed to have CHIP's quarterly distribution checks written out payable to MDW, Inc.; SMC also agreed to add or substitute the corporation's name and EIN for the defendant's name and SSN on several of CHIP's internal documents and documents that were part of the defendant's investment subscription agreement. The defendant started depositing many (but not all) of his CHIP quarterly distribution checks into a business account that he maintained for MDW, Inc. and MDWE.   He also started recording

these deposited checks as investment fees to MDWE in its accounting records.[5]

The efforts to appease the defendant did not deter him, however.   In or about April 2006, as part of his ongoing protests, the defendant prepared and recorded with the Pueblo County Clerk and Recorders Office a letter addressed to CHIP's accounting firm complaining about the tax reporting.   The letter, which was purportedly copied to the IRS, falsely asserted that the defendant had never given CHIP his SSN; that the taxpayer identification number that the defendant had given to CHIP was for his business instead; that the accounting firm had agreed to use the latter taxpayer identification number for tax reporting; and that the continued use of his SSN for tax reporting was incorrect and fraudulent.   The letter was not acted upon by CHIP's management and its accountants. Nor was it addressed by the IRS.

### The Defendant's Efforts to Change the Tax Reporting on His Real Estate Ventures.

The defendant fared better in his efforts to alter the tax reporting on sales of three investment properties which he had previously purchased and held in a personal capacity.   The defendant contracted to sell the first of these properties, an undeveloped real estate parcel located at 333 S. Hidalgo Drive, Pueblo, Colorado, in late October 2005 for $16,000. The contract, title and other closing documents all identified the defendant as the seller.   When, at the time of closing a month later, the title company presented the defendant with a form it needed him to complete for tax reporting purposes, an IRS Form W-9 (Request for Taxpayer Identification Number and Certification), however, the defendant scratched out his name and instead substituted

---

[5]       As discussed below, the deposit of these and other checks into the defendant's business accounts and their treatment as corporate receipts allowed the defendant to offset this income against purported business expenses and net operating losses sustained by the businesses and so did not generate any tax liability to the defendant's corporations.   The shifting and corresponding offset of these and other items of personal income to the defendant's businesses was part of the defendant's overall tax evasion scheme.

the name of his company "M.D. Williams, Inc."; he also handwrote in the EIN for MDWE on the part of the form requesting the taxpayer's identification number. Based on the completed form, the title company then issued the defendant an IRS Form 1099-S identifying MDW, Inc. as the seller on the transaction and reporting the $16,000 sale under MDWE's EIN. Consistent with this switch, the defendant had the title company make his seller's proceeds check payable to MDWE and later deposited the check into his business account for MDWE.   The Form 1099-S was ultimately filed with the IRS, and the $16,000 sale was recorded in IRS records under MDWE's taxpayer account.[6]

The defendant proceeded in substantially the same manner with respect to the two other real estate transactions.   In March 2006, the defendant sold a residence located at 427 Morrison Avenue in Pueblo for $115,000.   This property too the defendant had previously purchased and held in his own name, and the documentation prepared in connection with the transaction identified him as the seller.   The defendant again altered the IRS Form W-9 prepared for tax reporting to reflect that the seller was, in fact, MDW, Inc., and he again supplied MDWE's EIN. As before, at his request, the title company made the seller's proceeds check payable to MDW, Inc., which the defendant deposited to a business account and recorded in his business accounting records. And, as result, as before, the title company generated a Form 1099-S reporting the sale to the IRS under MDWE's name and EIN.

In August 2006, the defendant completed the sale of the third property, his erstwhile personal residence at 1806 E. 8th Street, in Pueblo, for $47,500. The defendant, for a third time, altered the IRS Form W-9 presented to him at closing to identify MDW, Inc. as the seller and its EIN as the taxpayer identification number to be used for tax reporting.   He deposited the seller's

---

[6]     The defendant nevertheless failed to record the transaction in his business accounting records and so the transaction was not taken into account in the return that the defendant ultimately filed a return for MDWE for 2005.

proceeds check made out to MDW, Inc. into MDWE's business account and recorded the transaction in its accounting journals.   The resulting IRS Form 1099-S sent to the IRS reported the sale under MDWE's taxpayer account number.

**Defendant's Formation and Use of Skyview Trust.**

Beginning in 2006, the defendant started drawing most of his money out of his businesses through payments to a purported trust called "Skyview." The previous November, the defendant had purported trust documents drawn up forming Skyview. The documents identified the defendant's office manager at the time (identified herein as "DCW") as the trust's settlor and represented that, as settlor, DCW was funding the trust with certain unspecified real and personal property in exchange for "100 Trust Certificates." Other documents prepared by the defendant identified the defendant himself as the holder of all of these certificates and appointed him manager of the purported trust.

The defendant presented the Skyview documents to DCW to sign as the trust's "settlor," explaining to her that the documents were in connection with a new corporation that he was forming as part of a promise to reorganize and operate Greenview in partnership with DCW. DCW executed the trust documents believing that they were part of her newly founded business venture with the defendant.   Shortly thereafter, the defendant asked DCW to help him transfer certain of his vehicles into Skyview's name. DCW refused. Sometime in mid-2006, DCW left the defendant's employ. At the time, DCW had understood from the defendant that all that had been done with respect to Skyview was to open a bank account in its name, using $1,000 in funds contributed by the defendant.[7]

---

[7]    In fact, apart from the preparation and execution of trust documents and the defendant's use of its name to (continued on next page)

Unbeknownst to DCW, in mid-April 2006, the defendant opened a brokerage account in the name of Skyview Trust at branch of RBC Dain Rauscher ("RBC") in Pueblo, Colorado using RBC's SSN as the taxpayer identification number for the purported trust.[8]   The defendant identified RBC as the settlor of the trust and himself as trust manager in the account opening documents and provided his telephone numbers and addresses for the contact information on the account. Shortly thereafter, the defendant started transferring funds from his business accounts for Greenview and MDWE to the Skyview RBC brokerage account.   In particular, over the course of June 2006 through October 2006, the defendant wrote checks to Skyview from his Greenview bank account totaling $91,000, which he deposited to the Skyview RBC brokerage account; the defendant recorded these checks as consulting fee payments in Greenview's accounting ledgers. Over this time frame, the defendant also wrote $13,000 in checks to Skyview from his MDWE bank account, which checks he also deposited into Skyview's brokerage account.   The defendant recorded these Skyview checks in MDWE's accounting ledgers as either payments of consulting fees or profit payments to one of his real estate partners.   The checks and accounting entries made it appear that the defendant was making payments to third parties for business expenses incurred by his corporations, when, in fact, the defendant was simply making payments to himself.

Starting in 2007, the defendant began transferring some of the CHIP distribution money he was receiving to the Skyview RBC brokerage account.   Over the course of that year, the

---

open and use a brokerage account (discussed below), nothing further was done to establish Skyview as real and viable trust entity.   Skyview neither had a taxpayer identification number with the IRS, nor did it file tax returns.   Nor is there any evidence that it was funded apart from the funds that the defendant transferred to this brokerage account.

[8]      As a consequence, while denominated a trust account with RBC, the brokerage account, for tax reporting purposes with the IRS, was considered an account whose activities would be reported under DCW's taxpayer's account with the IRS.

defendant transferred $11,400 in CHIP distribution funds either directly or indirectly to this brokerage account. He also deposited to the Skyview brokerage account the $150,000 in principal that he received back from CHIP in February 2008, in connection with the winding up of the real estate investment pool. And he started using the account to deposit funds he received from other business activities as well.[9]  While the defendant used some of the funds for personal expenses and investments, much of the money that he transferred to and deposited into the Skyview brokerage through February 2008 remained in the account earning interest and dividends.[10]

**The Preparation and Filing of False and Misleading Corporate Returns.**

**2003 Returns for Greenview and MDW, Inc.**

Sometime in or about early 2005, the defendant re-engaged TC, the tax preparer he had used to prepare his 1999 individual federal income tax return and Greenview's corporate federal income tax, to prepare additional federal returns for him.   He told TC that this time he only needed two corporate returns prepared for a single year, 2003, one for Greenview and a second return for MDW, Inc. When questioned, he told TC that he was taking care of his individual tax returns himself.   The defendant provided TC with a set of both businesses' accounting records to prepare the returns.

---

[9]    For example, as shown at trial, on May 18, 2007, the defendant deposited to the Skyview brokerage account $67,019.99 that he received in repayment of a short term bridge loan that he extended to a married couple, in connection with the refinancing of the couple's commercial property in Pueblo, Colorado.   The defendant made and received repayment on this loan, which included accrued interest, under the name Skyview.

[10]    As a consequence of the defendant's use of DCW's SSN to set up the Skyview RBC brokerage account using DCW's SSN, each of the IRS Forms 1099 that RBC prepared and filed with the IRS reporting the interest and dividends earned on the account for these years and beyond -- though addressed to the defendant in his capacity as "trust manager" and delivered to a post office box he controlled -- were recorded by the IRS under DCW's taxpayer account as income to her personally and not income either to the purported trust or to the defendant.

DCW testified at trial that she was unaware of this IRS reporting until shortly before trial when she first saw these Forms 1099.

The returns prepared by TC and filed later that year by the defendant identified him by name as the 100% owner of both corporations.   Although the returns showed both corporations receiving significant revenues and having gross profits in 2003, they reported no taxable income for either corporation and so no tax liabilities. Nor did the returns reflect the payments of any wages, salaries or compensation of any sort either to the defendant or any other employee, though the forms provided specific categories for listing these types of payments.   The payments that the defendant received from these businesses were instead included as part of broader figures on the corporate returns under the category costs of goods sold and so served as offsets to income earned by the businesses and hence figures that reduced their corporate tax liabilities.   Without a set of the businesses' accounting records for the year, neither the IRS nor anyone else looking at the face of the corporate returns could discern how much the defendant was receiving from compensation from these businesses for the 2003 year.[11]

### Greenview's Additional Returns (2004 -2006) and Returns for MDWE (2005-2006).

In or about November 2007, the defendant engaged JG, another Pueblo tax preparer, to

---

[11]     TC testified at trial that she could tell from the accounting records she got for Greenview that the defendant received about $42,000 in payments from Greenview for 2003.   She testified that consistent with the way similar payments had been treated   in corporate returns for Greenview in prior years she treated these payments as contract labor payments and that they were accounted for as part of the larger cost of labor figure set forth in Greenview's return (*i.e.*, $139,619).

TC testified that this was the wrong way to account for these payments for tax purposes, as the payments were really compensation for the defendant's services to the business and so should have been reported as some sort of officer or employee compensation which would have subjected the defendant to self-employment tax on the payments. TC testified that she had advised the defendant that this was the wrong accounting treatment when preparing Greenview's 1999 returns.   The payments should have also been the subject of informational reporting by Greenview, through the issuance and filing of either an IRS Form W-2 or, barring that, an IRS Form 1099.   TC testified that she had prepared   IRS Forms W-2 for the defendant and his Greenview employees for a prior year, 2002. IRS records reflect that the defendant filed neither form for himself or any of his employees for either business in 2003 or beyond.

TC could not tell, without inspecting the accounting records, how much (if anything) the defendant received from MDW, Inc. for the year. Its return for the year reported only "purchases" under the costs of goods category.

prepare an additional set of federal corporate income tax returns for Greenview (for tax years 2004 through 2006) and a set of federal corporate returns for MDWE (for tax years 2005 and 2006) .[12] The defendant told JG that he had fallen behind with the filing of his corporate returns and needed to catch up and that JG need only concern himself with these corporate returns, explaining that he handled his personal taxes himself. JG asked for and received a set of accounting records for both businesses for the years in question.   He also asked the defendant for a set of prior income tax returns for both corporations, so that JG could accurately calculate various figures that were derived from prior tax years.   The defendant told JG that the returns were warehoused and he would need to look for them.   He identified another tax preparer in town, a man, as the person who had prepared the returns but indicated that he could not get the returns from him.   After a series of reminders, the defendant told JG he could not locate these prior returns.[13]   The defendant also indicated to JG that, while the defendant operated both businesses and had authority to speak for them, they were actually owned by or through a trust which the defendant identified as Millstone.   He gave JG no further details about the trust, such as the identities of its trustees and beneficiaries,[14] and indicated that he would need to get back to JG with the trust's EIN, something JG would need to complete both sets of returns.

---

[12]      As indicated above, MDWE was a second corporate entity under which the defendant operated his real estate investment business.   The defendant obtained a separate EIN for MDWE and had not previously filed corporate returns under this EIN or name.

[13]      JG testified that he knew of TC and that their offices were in the same building but that the defendant never identified TC as his prior tax preparer.

[14]      JG provided somewhat inconsistent testimony concerning the relationship between Millstone, the defendant and the corporations.   In testimony before trial, JG indicated that he understood that the defendant owned the corporations through Millstone and that he controlled this trust.   At trial, JG denied knowing anything more from the defendant than that Millstone owned both corporations.

JG completed the Greenview returns first and presented them to the defendant to review and sign in early December 2007.   While reporting minimal receipts and gross profits for Greenview for 2004, the returns showed significant and growing receipts and gross profits for the remaining two years.   However, none of the returns reported any taxable income, and therefore any tax liabilities, for any of these years. And, as with the 2003 return prepared by TC, none of the returns reported Greenview paying any wages, salaries or compensation of any sort either to the defendant or anyone else.   While the accounting ledgers showed the defendant receiving minimal money from Greenview in 2004 and some money in 2005,[15] these payments were again treated as contractor payments, a component of costs of goods sold (and hence an offset to the corporation's receipts) in Greenview's tax returns for these years.[16]   And Greenview's accounting records showed no payments relating to services or employment going to the defendant in 2006. Knowing little more than what was recorded in the accounting journals, JG treated the $91,000 in payments to Skyview that the defendant booked as consulting expenses as just that and included them on the 2006 return as one component of the company's overall costs of goods sold for the year.

Not only did these Greenview returns fail to reveal the money that the defendant had received from the company for these years, they failed to show any clear connection between the

---

[15]       The ledgers showed the defendant receiving no more than $500 from Greenview as possible compensation for employment or services in 2004.   They showed him drawing $5,250 as possible compensation in 2005.

[16]       JG testified that he treated the payments that he saw going to the defendant in the account ledger as contractor payments, after talking to the defendant or one of his employees and learning that Greenview had not issued Forms W-2 to the defendant or its other employees for the years in question.   JG was under the impression that these payments had been reported to the IRS through Forms 1099 and so treated the defendant as if he were an independent contractor to the corporation.

defendant and the company.[17]   As directed, JG listed Millstone Trust as the 100% owner of

Greenview in each of the returns. When the defendant came to pick up and sign the returns, he

presented JG with a letter from the IRS assigning Millstone its EIN.   The letter was dated

December 5, 2007, suggesting that the EIN application was of recent vintage, and it was addressed

to one of the defendant's regular sub-contractors (identified herein as "RMMK"), referencing him

as Millstone's trustee.[18]   After inspecting the letter, JG handwrote the EIN listed in this letter next

to Millstone's name in the portion of the returns identifying Millstone as Greenview's owner.   He

gave the completed returns to the defendant, who shortly thereafter mailed them to the IRS.

JG completed the 2005 and 2006 returns for MDWE in early January 2008 and gave them

to the defendant to review and file.   These returns too listed Millstone as the corporation's 100%

owner, identifying the purported entity by its newly issued EIN.   These returns also showed

significant and growing receipts and gross profits but no taxable income or tax liabilities for either

year.   They too failed to reveal any employee or officer compensation payments either to the

defendant or anyone else, despite accounting journal entries showing that the defendant had

received wages or other compensation in both years.[19]  JG treated these payments instead as

sub-contractor expenses and, classifying them as a component of the corporation's cost of goods

---

[17]      While the defendant signed these returns for the corporation, his name was not printed in the signature block, and only a person familiar with his handwriting and signature would have been able to identify him as the signer.

[18]      RMMK testified at trial that he recalled hearing about Millstone and had agreed to help the defendant out by acting as a trustee for one of several trusts that the defendant was forming and that Millstone sounded familiar and may have been the trust for which he agreed to serve as trustee.   RMMK testified this trust was, to his knowledge, used by the defendant in an attempt to protect the defendant's personal and business assets and that RMMK assisted the defendant in transferring several of his vehicles to the particular trust for which RMMK agreed to serve as trustee.

[19]      MDWE's accounting records recorded in excess of $20,000 in wage payments to the defendant in 2005 and $2,500 in similar payments to him in 2006.

sold, grouped them with other items into this larger category in the corporation's returns.   Not knowing any better, he did likewise with respect to the payments that he saw going to Skyview.[20]

The MDWE returns also included, as part of the corporation's receipts, some of the personal income that the defendant had received from CHIP and seller's proceeds reported to the IRS on two of the defendant's three personal property sales in 2005 and 2006 (discussed above).[21] The inclusion of these income items in the returns did not alter the corporation's tax liability for either year, however, as they were more than offset by various deductible business expenses or carry forward net operating losses that were claimed in the returns.

Through the foregoing returns prepared and submitted for Greenview and MDWE, the defendant, in short, accomplished two things: He concealed from the IRS income that he was getting from both corporations over the course of 2004 through 2006; and he shifted on paper some other items of personal income he was separately receiving during these years so that the income could escape taxation by being offset by corporate business expenses (some of which were simply payments to himself or for his benefit).

---

[20]      JG testified that at some point over the course of preparing returns for both Greenview and MDWE he told the defendant that he was treating the corporations' payments to the defendant as if the defendant were an independent contractor and indicated that the defendant would still have to report the money he was receiving from the corporations on his personal tax returns and be subject to tax on the payments.

[21]      Based on the accounting entries, JG included monies that the defendant received from his sales of 427 Morrison Avenue and 1806 E. 8th Street, booked as management or investment fees, as part of MDWE's receipts for 2006.

MDWE's accounting records for 2005 also listed the company as receiving $27,124 in investment fees from CHIP for the year.   JG testified that he reviewed this entry with the defendant at some point while preparing the returns, however, and that the defendant told him that, despite the entry, the money really concerned either a loan payment or repayment relating to CHIP and that, because of this explanation, he did not include the $27,124 in MDWE's receipts for the year.   He did include $6,000 from CHIP that was booked as investment fees for 2006 in the receipts that were reported on MDWE's tax return for the 2006 year.

20

**The Government's Tax Loss Computations.**

The government, at trial, offered evidence showing the amount in federal income and self-employment taxes that the defendant was successfully able to evade for the years 2005 through 2007.   The evidence consisted of expert testimony of an IRS revenue agent who reviewed, among other things, the defendant's personal and business bank and brokerage account records and the accounting records and who attended the trial and listened to the trial testimony of the other witnesses in the case.   Using a series of explanatory summary charts, the IRS revenue agent identified the various sources and amounts of income that the defendant had for each of these years and, using these amounts, calculated the defendant's income tax and self-employment tax liabilities for each of these years, after taking into account various deductions and exemptions to which the defendant was entitled during these years.[22]   The revenue agent testified that he took a conservative approach that gave the benefit of any doubts or uncertainties left from the evidence to the defendant.   The defendant's additional tax liability, and hence the government's tax loss for these years, based on the agent's trial computations, is as follows:

| **Year** | **Total Tax Due and Owing** |
|----------|------------------------------|
| 2005 | $9,440 |
| 2006 | $46,732 |
| 2007 | $1,345 |
| **Total** | $57,517 |

---

[22]      The IRS revenue agent's explanatory summary charts, setting forth the computations and their bases, were marked and admitted at trial as GX 901 through 908.

IRS special agents who investigated this case reviewed the defendant's business and personal records for 2004 during the course of the investigation, and, using a similar methodology, calculated the amounts that the defendant owed in federal self-employment and income tax for the 2004 year.   They calculated that the defendant had at least $30,782 in total income in 2004[23] and owed at least $3,080.80 for the year.[24]

## Structuring Currency Transactions: The Defendant's Efforts to Liquidate the Skyview RBC Brokerage Account (Count 4).

By February 2008, with the return of his CHIP investment, the money that the defendant had been stockpiling in the Skyview RBC brokerage account had risen to more than $280,000. Beginning on or about July 28, 2008 and continuing through on or about September 29, 2008, the defendant took steps to remove significant amounts of money from this the account. He made a series of withdrawals from the Skyview RBC brokerage account in amounts ranging from $9,800 to $3,000.   He did so through checks that he wrote out and made payable either to himself or to RMMCK -- eleven checks in all, totaling $92,100.   All of the checks were signed by the defendant and negotiated for cash at Pueblo branches of Sunflower Bank, where the defendant had a number of bank accounts and (as discussed above) a line of credit.   All but three of the checks were for amounts just several hundred dollars under $10,000.   Eight of the checks appeared to be written out in pairs, each pair sharing the same date. Two pairs of checks were negotiated on the same day, one pair cashed over the course of one hour and the other within a ten minute period.[25]

---

[23]      This income consisted of $6,500 in wages and other payments to the defendant recorded in MDWE's accounting records for the year, as corroborated by banking records, and $24,372 in payments from CHIP.

[24]      These tax calculations were not presented at trial but are available to the U.S. Probation Office and the defendant for review now.

[25]      The eleven checks are listed and further described in Count 4 of the superseding indictment and in GX 921, a (continued on next page)

The defendant wrote eight of the checks out to himself.  The three others he gave to RMMCK to cash for him, despite writing in the memo sections of two of them that the checks were either a "gift" to RMCCK or were to "invest."  RMMCK testified at trial that the defendant said that he was going to start emptying his Skyview brokerage account around the time that he gave RMMCK these checks and that RMCCK agreed to cash them as a favor to the defendant.[26]  RMMCK gave the cash from each check back to the defendant. And he recalled one instance where he and the defendant rode together to the same Sunflower branch in order to cash two checks that were each just under $10,000.   RMMCK testified that after the defendant handed him his check, the two entered the bank branch together and went to separate teller lines to negotiate their respective checks.   After conducting the transactions, while still inside the bank branch, RMMCK handed the defendant the cash that he had just received.   Before the two could leave the branch, they were accosted by a teller who reprimanded them for what had just transpired; she told the defendant and RMMCK that what they had done was prohibited.   RMMCK testified that the defendant did not appear to be surprised by this reprimand and did not challenge it.   Indeed, RMMCK related that the defendant had explained to him at some point over the course of their dealings that the reason the defendant was writing out and cashing checks for amounts under $10,000 was that he wanted to avoid having reports filed with the federal government in connection with larger cash withdrawals.[27]

---

summary chart introduced at trial.

[26]     During his testimony, RMMCK also testified that he thought that some of the checks he was cashing for the defendant may have been to fund skydiving trips that the defendant often took.   RMMCK could not explain, however, why the defendant would have misdescribed their purpose in the memo sections if, in fact, they were simply intended to fund skydiving trips.

[27]     RMMCK was somewhat equivocal during trial as to whether he gained this understanding from the
(continued on next page)

At the time, domestic financial institutions like Sunflower Banker were, in fact, required by federal statute and regulation to file with the U.S. Treasury Department Currency Transaction Reports ("CTRs"), whenever conducting a transaction in currency exceeding $10,000, including transactions where the institution simply exchanged currency for a negotiable instrument such as a check. An IRS special agent trained in and knowledgeable about these financial institution currency reporting requirements testified at trial that CTRs, upon being generated, are accessible to the IRS and often used as tools by the agency as part of its tax enforcement work.   The special agent also provided testimony indicating that the eleven separate checks that the defendant caused to be negotiated in exchange for $92,100 appeared to be designed and structured to avoid having Sunflower Bank prepare and file CTRs reporting the cash that was going to the defendant. The agent observed that the transactions appeared to be connected to one another and looked to be part of an effort to withdraw more than $10,000 in cash on several given days; the agent observed that, at each point along the way, the defendant had more than enough funds in the Skyview brokerage account to obtain through just one transaction the cash that he was getting through these multiple connected transactions[28] and that it would have been more efficient for the defendant simply to have written single checks for these $10,000-plus amounts rather than to break them up the way he did.

The defendant used some of the $92,100 in cash that he received from these structured currency transactions to buy gold.  On at least one occasion, the defendant structured his gold

---

defendant before or after the teller's reprimand.

[28]     Records for the Skyview RBC brokerage account reflect that throughout the time that the defendant was making these check withdrawals the cash balance in the brokerage account never dropped below $144,108.01, having started above $280,000 when   the cash withdrawal transactions began.

purchases to evade a separate -- but similar – federal currency reporting requirement imposed upon businesses receiving more than $10,000 in cash payments in connection with a sale or service.[29] RMMCK testified at trial that the defendant recruited him at one point to accompany the defendant on trip to a Colorado Springs gold dealership to buy gold coins. He related that he traveled with the defendant in the same vehicle and that before the two entered the dealership, the defendant gave him approximately $9,000 in cash from a wad of bills that the defendant had in his possession. Once inside, the defendant and RMMCK approached separate employees and made separate gold coin purchases, RMMCK converting the cash he had received moments before    into one set of gold coins while the defendant, using an equivalent amount of cash from the bills still in his possession, bought another set of gold coins. RMMCK pocketed his gold coins and turned them over to the defendant once the two had departed the dealership. RMMCK related that the reason that the defendant split up the cash and the gold purchases this way was so that the defendant could avoid some sort of government form – RMMCK thought it was a tax statement – that the defendant understood would be generated if more than $10,000 in gold were purchased.

The defendant's efforts to liquidate the Skyview RBC brokerage account extended beyond the $92,100 in cash that he removed from the account.  Skyview's brokerage account records reflect that over the course of July through October 2008, while removing cash from the account, the defendant also transferred approximately $51,530 in Skykview brokerage account funds to a relative in California (identified herein as "RW") through six checks made payable to the relative in amounts ranging between $6,000 and $9,800.   In interviews with the government during the

---

[29]        Such businesses must prepare and file with the Treasury Department a form similar to a CTR called an IRS or FINCEN Form 8300.   This form, upon being filed, is similarly accessible to the IRS and is used by the IRS in the same way that the agency uses CTRs.

course of the investigation of this case and in preparation for trial, RW acknowledged receiving these funds from the defendant and safekeeping the money for the defendant at the defendant's request.   He stated that he deposited the checks into a bank account that he controlled and, at the defendant's request, used some of the money to pay the defendant's property taxes and other personal expenses. He also recalled giving some of the money back to the defendant when the defendant visited him in California, including $10,000 in cash he gave to the defendant in 2010.

**The Defendant's Efforts to Pass Bogus U.S. Treasury Checks:**
**Bank Fraud (Counts 5-6) and Fictitious U.S. Financial Instruments (Counts 7-9).**

The evidence at trial established that, over the course of November 2009 through February 2010, the defendant attempted to pass three checks, in the aggregate totaling $305,000, that purported to be U.S. Treasury checks.   While the checks were fabricated and worthless, and none were successfully processed for payment, they had the hallmarks and indicia of real checks that had been issued by the Treasury Department.   As described below, two of the checks, totaling $55,000, were tendered to a Pueblo, Colorado branch of Colorado East Bank & Trust ("Colorado East"), an FDIC insured bank, in November 2009.   The third check, for $250,000, was tendered to the State of Colorado, Fourth Judicial District, El Paso County, County Court (hereinafter, the "El Paso County Court"), in connection with a criminal misdemeanor case that had just concluded against the defendant.

**The Defendant's Bank Fraud Conduct.**

On or about August 8, 2008, RMMCK opened a business bank account at Colorado East under his name, doing business as Greenview Construction.   RMMCK testified at trial that he was asked to open this account at the defendant's request in order to assist the defendant with Greenview's financial affairs while the defendant was outside the Pueblo area on other matters.

The account was opened using the defendant's telephone numbers and an address for a farm that the defendant's family had in Pueblo County and was funded by money from the defendant. After the account was opened, account statements were delivered to a post office box held by the defendant and the statements and other records for the account were maintained in the home office of the defendant's residence.   Soon after the account was set up, the defendant started leaving on extended trips outside the State of Colorado.[30]

In or about early November 2009, upon his return to Pueblo, the defendant asked RMCCK to deposit a $25,000 check into the Colorado East account for Greenview.   The defendant said that the check was to repay a loan that he had taken from the business.   The defendant provided RMMCK a purported check for this amount which had markings on it that made it appear to have been a U.S. Treasury check, including printing indicating that the check was from the "United States Treasury, Financial Management Services, c/o Treasury UCC Contract Div." Made payable to "Greenview Construction," other printing on the check made it appear to have been for the benefit of the defendant.   The check appeared to have been signed by the defendant in a signature block that had the following description: "Warranted Contract Officer/Authorized Representative." At the bottom of the check were a series of numbers that appeared to correspond to routing and bank account numbers, as seen on genuine checks, and, as with typical checks, a pre-printed check number (Check No. 1551) appeared in the top right corner.[31]

---

[30]     Several of these trips, RMMCK testified, were to attend seminars and meetings that appeared connected to the defendant's emerging "sovereign citizen" views and philosophy and, in particular, some of the conduct that is the subject of Count 10 of the superseding indictment, discussed below.

         At one point during his extended absence, the defendant confided in a telephone call to RMCCK and another individual that he had left Pueblo because he believed that the IRS and FBI were after him.

[31]     The check was marked and introduced at trial as GX 402A.

RMMCK deposited this check to the Colorado East Greenview account on or about November 9, 2009.  Colorado East bank account records reflect that a second check, in the amount of $30,000, was deposited to the account three days later.   Except for the check number (No. 1553) and the amount, this check appeared virtually identical in its markings and format to the $25,000 check deposited by RMMCK. It shared the same check date (November 5, 2009) and was also payable to Greenview Construction. It too appeared to have been signed by the defendant.[32]

Colorado East bank employees, seeing that the checks had routing numbers corresponding to accounts with the U.S. Treasury, treated them as U.S. Treasury checks and put them into the Federal Reserve check processing system for processing and payment. However, on November 16 and November 18, 2009, Colorado East received notification back from the Federal Reserve that the checks were being returned unpaid because the checks were deemed "Non-Treasury Item(s)." The purported checks had indeed borne the correct routing number for the U.S. Treasury, but the account number was invalid; there was no account number at the Treasury corresponding to the account number listed on the checks.

Colorado East bank officers reversed the deposits in the Greenview account.  While it had paid some checks drawn on the Greenview account in the interim, the bank did not suffer a loss; prior to the $55,000 in bogus deposits, the account had had a $8,973.89 balance, enough in funds to cover the check payments, totaling $2,400.   Notwithstanding, the bank had been put at risk of loss: As bank account records reflect, Colorado East had immediately credited the Greenview account for the full amount of the bogus deposits when they were made.   As a result,

---

[32]     This check was marked and introduced at trial as GX 403A

the balance in the account had artificially risen to as high as $63,273.89 and remained above $60,000 over the course of a five day period, before the bad deposits were caught and reversed. Because of this, Colorado East bank officers decided to close the account.   A bank officer met with RMMCK and told him the account was being closed as a result of the two bad deposits. She returned the bogus Treasury checks to RMMCK, who acknowledge making the first deposit but disclaimed knowledge of the second.

RMMCK testified that he confronted the defendant when he learned about the bad deposits.   The defendant initially told him in a telephone call that the checks were valid and that Colorado East bank officer did not know what she was talking about.   When RMMCK met with the defendant and returned the bogus checks to him, the defendant acknowledged that he had fabricated the checks but maintained he was justified in doing so. The defendant explained to RMMCK that the checks were simply part of his ongoing efforts to draw on funds he believed were credited to him in an individual account he had on hand with the U.S. Treasury.   RMMCK testified at trial that he had previously heard the defendant engage in some talk about how the defendant, like other U.S. citizens, had a pool of funds on hand with the U.S. Treasury and that the funds were kept in some type of account that could be drawn upon if desired.   RMMCK recalled the defendant previously mentioning preparing some sort of "bonds" to accomplish this, but he had not known about using purported Treasury checks for the same purpose before this conversation.[33]

---

[33]    The defendant's use of these purported Treasury checks and purported bonds (mentioned to RMMCK and discussed further below in connection with the offense conduct relating to Count 10 of the superseding indictment) -- when assessed in light of his rhetoric and statements about them and the documents tendered to the El Paso District Court with respect to the $250,000 check, discussed below --   appears to fit a profile for similar schemes involving so-called "sovereign citizens" which the U.S. Department of Justice has investigated and prosecuted over the years. The Department has described these as "redemption schemes."

The Department's Tax Division has explained that aspect of the redemption scheme involving bogus
(continued on next page)

**<u>Tendering a Bogus Treasury Check to the El Paso County District Court</u>.**

On or about February 8, 2010, the El Paso County Court received in the mail a manila envelope, addressed to the Hon. Karla Hansen, an El Paso County, County Court Judge, and Mary V. Perry, then the Clerk of the Combined District and County Court for El Paso County.   The envelope contained a series of documents, including correspondence and notices from the defendant, many of which referenced a criminal misdemeanor false reporting case, El Paso County Case No. 2006M1224 (hereinafter, "El Paso County Case 06M1224"), for which the defendant had previously been charged, tried, convicted and sentenced.[34]

---

financial instruments as follows:

> ... The "redemption" scheme involves the use of fictitious financial instruments, sometimes called "Sight Drafts," "Bills of Exchange," or other titles, as well as the filing of Forms 8300, 4789, and 1099 and SARs. ...

> ... The fictitious financial obligation component of the "Redemption" scheme is based on the premise that, when the United States went off the gold standard in 1933, the government began to be funded with debt instruments secured with the energy of current and future inhabitants. The theory is that a fictitious identity or "straw man" was created for all Americans and the value of a person's birth certificate became the collateral for United States currency. Supposedly, the value of an individual's birth certificate is determined by the number of times it is traded on the world futures market, and the amount is purportedly maintained in a Treasury Direct Account under that person's social security number.

> A participant in the scheme attempts to reclaim his or her "straw man" and therefore the value of the fictitious identity by redeeming his or her birth certificate. The participant sometimes files a Form UCC-1 with the Secretary of State in any State, claiming title and a security interest in his or her social security, driver's license, and birth certificate numbers. The individual then writes "acceptance for value," "non-negotiable charge back," or other prescribed language diagonally on a government paper and returns it to the government official who issued it. Typically, the types of documents used for redemption include anything from a traffic ticket to a federal indictment. The "charge back" allegedly creates a "treasury direct account" that contains the amount assigned to the charge back, which the participant purportedly can then draw upon by writing a fictitious check. These fictitious financial obligations are then written for varying amounts, some as high as trillions of dollars. A Form UCC-3 indicating the partial release of collateral in the amount of each sight draft may be filed with the same Secretary of State who accepted the Form UCC-1.

U.S. Dept. of Justice, Criminal Tax Manual (2012), Sections 40.02 [1], 40.02[1][b] (http://www.justice.gov/tax/readingroom/2008ctm/ctmcombined.pdf)

[34]     The misdemeanor false reporting case arose from and related to a separate criminal misdemeanor case brought against the defendant in the El Paso County, County Court (Case No. 2005M6119)(hereinafter, "El Paso County Case 05M6119").   That case concerned a traffic stop and altercation between the defendant and Colorado Springs police officers that took place on July 31, 2005, and the defendant was charged in Case 05M6119 with (continued on next page)

Judge Hansen had been the presiding judge presiding in the case and, on October 19, 2006, following the defendant's conviction by a jury, had sentenced the defendant to a 90-day jail term, which she stayed when the defendant initiated an appeal. After the appeal was dismissed, Judge Hansen ordered the defendant to appear for a hearing on December 14, 2007, in connection with completing his jail sentence, but when he failed to appear at the hearing, she issued a warrant for his arrest. When the El Paso County Court received his February 2010 mailing, the defendant was still a fugitive on this warrant, having eluded arrest and having otherwise failed to voluntarily appear before the district court on the case following the December 17th hearing.[35]

Among the items within the envelope received by the El Paso County Court was a purported U.S. Treasury check for $250,000, made payable to the "Forth [sic] Judicial District Colorado Dept. of Justice." The memo section of the check contained the handwritten note, "This is a Private Investment." Apart from the date on the check and the check number, this check otherwise appeared substantially identical -- in its format, printing and markings -- to the two bogus Treasury checks that the defendant had tendered to Colorado East in November 2008.[36] There was also a letter from the defendant, addressed to Judge Hansen and Clerk of Court Perry,

---

misdemeanor and traffic offenses relating to and arising from the incident. He was tried and convicted of a lane usage violation and obstructing a peace officer following a jury trial in July 2006 but acquitted on other charges.

The false reporting charge in Case 06M1224 stemmed from a complaint that the defendant made with the Colorado Springs Police Department in October 2005, while the 05M6119 case was pending. The defendant accused the police officers who had been involved in the July 2005 incident of misconduct but the complaint was determined to be baseless following an investigation.

[35]     The defendant to this day remains a fugitive on El Paso County Case 06M1229 and the warrant remains unexecuted.

[36]     The original $250,000 check was included as part of a composite trial exhibit, marked and admitted as GX 307, consisting of all of the original items that were mailed to the El Paso County Court. A copy of the check was also marked as GX 308.

entitled "Notice and Demand."   The letter described the check as being "for settlement and closure of account 2006M1224 4th judicial district Corporation"   and   referred to the check and accompanying documents as the defendant's settlement offer in the case.   These items, in turn, included copies of the defendant's birth certificate and a court certified copy of Judge Hansen's arrest warrant in the case, reflecting a certification date of April 13, 2009.[37]   The El Paso County Clerk's Office declined to negotiate the check.   Rather, it held onto the check and the other contents of the February 2010 mailing until turning them over as evidence to the federal agents who investigated this case.

## Interfering with the Administration of the Internal Revenue Laws (Count 10): The Defendant's Misuse and Abuse of IRS Forms in Connection with His State Cases.

On or about October 28, 2008, the defendant caused to be mailed to Henry M. Paulson, Jr., then the Secretary of Treasury, correspondence and documents requesting, and relating to a request, that funds in a purported personal Treasury account, identified by a number corresponding to his SSN, be used by the Treasury Department to settle, pay and resolve various debts and obligations that were outstanding against him. In a cover letter to the Treasury Secretary, the defendant requested, in particular, that the Treasury Department file federal tax returns and other federal tax forms for the years 1995 through 2008 – and "any other tax year may be in question or may be due from [the defendant]" – as "previous tax filings may not have been completed correctly and or [sic] without proper knowledge of the IRS tax codes and should be disregarded."[38]

---

[37]        The mailing also included an IRS Form 56, Notice Concerning Fiduciary Relationship.   This form and this mailing were part also part of the defendant's offense conduct concerning Count 10, and the form and its significance are further discussed, below, in the context of describing that conduct.

[38]        The letter was included with the rest of the items sent in the October 28, 2008 mailing as a trial exhibit and marked and admitted as GX 204.

He requested that his purported personal Treasury account be used to settle his tax liabilities and identified by specific reference two State of Colorado court cases as other matters that he wished to resolve and settle using the account:   El Paso County Case 06M1224 (the criminal misdemeanor false reporting case discussed above) and a Pueblo County, District Court Case, Case No. 2005CV176)(hereinafter, Pueblo County Case 05CV176"), a civil contract and property dispute case that had been decided against the defendant after a bench trial.[39]

Among the documents the defendant caused to be included in this mailing was an IRS Form 56, Notice Concerning Fiduciary, purporting to appoint Paulson and his successors as fiduciaries to act on behalf of the defendant to settle accounts and disputes and in connection with specified tax matters;[40] a copy of the defendant's birth certificate stamped, in part, "Accepted for Value by Drawee;" and a purported bond entitled "Non-Negotiable Unlimited Private Bond For Set-Off."

Over the course of November 2008, the defendant caused to be mailed to Secretary of Treasury Paulson similar correspondence and documentation.   The correspondence and accompanying items requested, and relating to a request, that $300,000,0000, in particular, be deposited to the United States Treasury from the defendant's' purported Treasury account for the purpose of settling his various obligations, including obligations in El Paso County Case

---

[39]     The defendant was the defendant in Pueblo County Case No. 2005CV176 (hereinafter, "Pueblo County Case 05CV176"). Suit was brought against him in 2005, and the bench trial in the case took place in August 2006, presided over by the Hon. Victor I. Reyes, a Pueblo County District Court Judge.   On or about January 29, 2007, Judge Reyes issued an order finding for the plaintiff in the civil case and ordering the defendant to pay the plaintiff   $575 in damages and to pay the plaintiff $575 in attorney's fees.

[40]     An IRS Form 56 is a form designed to allow a person to be appointed as a fiduciary to act on behalf of a taxpayer with respect to federal tax matters.   It is typically used when an individual dies and an executor appointed to act for the deceased's estate undertakes to address the estate's tax matters.

06M1224.   Among the documents the defendant caused to be included in these mailings were IRS Forms 56 purporting to appoint, among others Judge Hansen, the Clerk of the El Paso County District Court and various El Paso County law enforcement officials as his fiduciaries to settle accounts and disputes in relation to Case 06M1224; copies of court documents and docket sheets in Case 06M1224 stamped, in part, "Accepted for Value by drawee"; and purported bonds in the amount of $300,000,000, entitled "Discharging and Indemnity Bond[s]," which bonds included Pueblo County Case 05CV176 and El Paso County Case 06M1224 and Judges Reyes and Hansen in a list of "accounts" and "account holders" to be satisfied by the bonds.   The defendant, during this time, also caused a similar packet to be mailed to the Treasury Secretary that focused on Pueblo County Case 05CV176 and various IRS Forms 56 appointing Judge Reyes and various Pueblo County law enforcement officials as fiduciaries in connection with settling accounts and disputes related to the defendant's Pueblo County civil case.

Throughout 2009, the defendant mailed to various IRS offices around the country IRS forms and correspondence that appeared to arise from and in some way be connected to this late 2008 overture to use his purported personal Treasury account to satisfy his obligations in El Paso County Case 06M1224 and Pueblo County Case 05CV176.   The defendant also started sending the IRS offices correspondence and IRS forms that concerned his other El Paso County criminal misdemeanor case, Case 05M6119 ( the case, as discussed above, which preceded and led to Case 06M1224), in an apparent effort to "resolve" it using his purported personal Treasury account as well.   The defendant submitted to the IRS, for example, a set of three IRS Forms 1099-A, entitled Acquisition or Abandonment of Secured Property, for each of the three cases for the 2008 tax year. The completed forms identified the defendant as the "lender" and El Paso and Pueblo counties as "borrowers" on property that he identified in the forms as himself.   No dollar amounts were

specified in the forms.[41]

The defendant also sent to various IRS offices mail packets that included additional IRS Forms 56 appointing Judge Hansen and Clerk of Court Perry as fiduciaries with respect to the IRS, ostensibly in connection with resolving El Paso County Case 06M1224.   Some of the packets included GSA bond, surety and related forms, used in federal government contracting, which, in various places, referenced the El Paso County Case No. and an identifying number for the defendant's birth certificate.   One packet included a copy of the defendant's failure to appear arrest warrant in Case 06M1224, stamped, in part, "Accepted for Value by drawee."   At least one set of GSA and IRS forms were sent to the IRS, in relation to El Paso County Case 05M6119. These forms were completed in substantially the same way as the ones submitted with respect to Case 06M1224, except that an IRS Form 56 appointed Daniel Wilson, the presiding judge in Case 05M6119, as an IRS fiduciary for his case.

The materials that the defendant mailed to IRS were not acted upon by the agency, with one notable exception.   At some point following the IRS's receipt in May 2009 of one of the defendant's mailings, an IRS employee attempted to process an IRS Form 56 purporting to appoint Mary Perry, the El Paso County Clerk of Court, as his fiduciary, in relation to El Paso County Case 06M1224.   The employee apparently construed the form to be a fiduciary appointment in connection with the administration of a deceased taxpayer's estate and re-classified the defendant as being deceased in his taxpayer records with the IRS.   The IRS concluded that it could not

---

[41]        An IRS representative who served as the agency's record custodian at trial testified that IRS Forms 1099-A are typically used by lenders of secured property to report to their borrowers and the IRS uncollected debts that, if forgiven, may be deemed income to the borrower.   A typical example of when these forms would be legitimately used would be when a mortgage on a real property goes into foreclosure and a portion of the unpaid loan principal remains uncollected.

complete its processing of the form, however, apparently because the purported fiduciary, whom it

deemed Ms. Perry, had not supplied a taxpayer EIN for the estate. As a result, the IRS generated a

form letter, dated June 26, 2009, addressed to "Michael Destry Williams Estate, MV Perry Clerk

of Court FID," providing notice of this deficiency and the IRS's consequent inability to process the

Form 56.   The letter advised her to check her records for the EIN or to complete an application for

a new one and return the application to the IRS with the Form 56.

The form letter was mailed to the Ms. Perry at the Colorado Springs address for the El Paso

County Court, in a mail packet that included an IRS Form SS-4 to be used in applying for a new

EIN, together with the original packet that the defendant had sent the IRS in May 2009,which

included the unprocessed Form 56 for Perry.[42] Ms. Perry indicated at trial that this IRS

correspondence was apparently overlooked by court staff when it was received and that no

response was made to it.   For a period of time thereafter, the defendant remained erroneously

classified as a deceased taxpayer in IRS records.[43]

---

[42]      The original mailing, including the form letter, was marked as GX 311 and introduced as an exhibit at trial.

[43]      The defendant's status was ultimately corrected in IRS records, the government would be prepared to show,
as a result of contact with an IRS special agent who was involved in the investigation of this case.

Although not the subject of trial testimony, the government would further be prepared to show that the
defendant learned of his misclassification in IRS records and made efforts to correct his record himself in a series of
telephone calls with IRS representatives over the course of July through August 2009.   These calls came in the course
of another tax fraud scheme – to obtain fraudulent federal income tax refunds through the submission of false income
tax returns – in which the defendant apparently participated to some degree.   The scheme, and the defendant's role in
and connection to it, were the subject of a supplemental Fed.R.Evid. Rule 404(b) notice that the government filed in
this case (Docket Entry 68), which the government incorporates herein by reference.

As set forth in the notice, the scheme entailed preparing federal income tax returns that falsely claimed that
large tax withholding were being made on "Original Issue Discount" income that taxpayers who were filing the
fraudulent returns purportedly had earned.   The returns that were part of the scheme were prepared by a Missouri tax
preparer and were for persons recruited to the scheme who became his clients.   Evidence from a search warrant
identified the defendant as one of the clients for whom the fraudulent tax returns were being prepared.

As further set forth in the notice, the defendant's 2009 calls to the IRS concerned inquiries that the defendant
was making with the IRS regarding the status of a tax refund that the defendant said he was awaiting.   IRS records of
(continued on next page)

**The Defendant's Threats of Criminal Tax Investigations
and his Baseless Criminal Tax Referrals.**

As 2009 progressed, the defendant started pursuing other methods to resolve his state court cases to his satisfaction.   These methods too involved the misuse and abuse of IRS forms and processes.   In late January 2009, the defendant wrote Judge Hansen requesting that his false reporting criminal misdemeanor case with her be settled using funds that he purportedly had in an account he identified as "Fund #6, CUISP #316127109." He requested that the county judge provide him with something he called a "certificated presentment of the value of cost of charges," so that the case could be settled, and closed the letter by stating that he "looked forward to settling this dispute without involving the CID of the IRS."[44] He made no such veiled warnings to the trial judges in the other two state cases.

On or about May 29, 2009, the defendant caused completed IRS Forms 3949 A to be mailed to each of the three the trial judges in El Paso County Cases 05M6119 and 06M122 and Pueblo County Case 05CV176.   The forms, entitled "Information Referral[s], are designed to allow individuals to report information that they have concerning suspected tax violations and related offenses committed by taxpayers.   After screening, the forms are routinely routed to IRS CID special agents for review and possible criminal investigation.

---

the calls reflect that the defendant claimed that he was due a $775,000 for the 2005 tax year but that someone without authorization had erroneously changed his status to deceased in IRS records. Search warrant records reflect that one of the years for which the defendant was seeking a fraudulent refund was 2005 and that the defendant had provided the Missouri tax preparer with information to prepare a false tax return to secure a refund for that year.   The defendant's telephone complaints notwithstanding, as discussed above, IRS records do not reflect a return for the defendant for 2005, no less one claiming a tax refund.

[44]      The letter was marked as GX 310 and introduced as a trial exhibit.

         "CID" refers to the Criminal Investigation Division" of the IRS.

The IRS Forms 3949 A that the defendant completed and sent to each of the judges were substantially the same.   The defendant checked boxes on the forms indicating that each judge had committed tax violations involving failure to pay taxes; unreported income; and failure to file returns.   In the comments section of the form, he described the basis of these alleged violations, in part, as follows:

> Use of account 524080608 without legal or lawful permission,
> Failed to disclose any contractual obligation. Failed to disclose
> funds borrowed. Failed to pay taxation on said funds that is required
> and Failed to return funds to the beneficiary as directed. …[45]

The referrals were as baseless as they were nonsensical.   The judges had no involvement or interaction with the defendant, outside of their dealings with him in their respective cases.   These particular sets of referrals, unbeknownst to the recipients at the time, were not forwarded to the IRS by the defendant.   Notwithstanding, as Judges Reyes and Hansen indicated in their testimony at trial, the referrals, by virtue of their subject matter and the nature of the allegations, inherently gave rise to some level of concern on the part of the judicial officers.

The defendant did not stop with his May 29, 2009 mailings.   He ultimately chose to pursue his criminal accusations directly with the IRS, focusing, however, on only one case, El Paso County Case 06M1224, the false reporting case in which he still had an uncompleted jail sentence. On or about March 29, 2010, after his $250,000 purported Treasury check had been ignored, the defendant had a packet of documents concerning El Paso County Case 06M1224 mailed to three separate IRS offices across the United States.   One of the offices was an IRS CID office in Covington, Kentucky.   The mail packets sent to each office contained copies of the arrest warrant

---

[45]     The forms were marked as GX 306, 312, and 313 and admitted at trial.

The referenced "account" number corresponds to the defendant's SSN.

and other court documents in El Paso County Case 06M1224, each stamped, in part, as before, "Accepted for Value by drawee."   They also included information referrals on IRS Forms 3949 A, one for Judge Hansen and the other Clerk of Court Perry.   The referral forms were substantially the same as the ones that the defendant had mailed to the state court judges in May 2009.   They listed the same tax law violations and used similar language in describing the basis of the accusations. However, these sets of referrals now identified the "taxpayers" – *i.e.,* Hansen and Perry – as "dangerous."[46]

The referral forms were routed to an IRS CID special agent for review.   However, by this point, the defendant had been under criminal investigation for several years for conduct at issue in this case, and the referrals came to an IRS CID special agent who was working the case, who took them in as part of evidence that was being gathered in investigation of the defendant.

On or about December 15, 2010, the defendant mailed one final packet of documents to the IRS.   The packet of documents, addressed to the criminal divisions of two separate offices, contained an assortment of IRS forms that the defendant filled out with respect to El Paso County Case 06M1224 and included informational referrals on nine different IRS Forms 3949 A with respect to nine different individuals.   In a cover letter accompanying the forms, the defendant referred to the subjects of the referrals as borrowers who had failed to report or pay taxes on an account which he identifies as being Case 06M1224. He also complained that the El Paso County Court, which he described as a corporation, was committing various offenses, including identity theft, fraud, embezzlement, securities fraud and theft of public funds.[47]

---

[46]   The forms and other materials were marked and introduced at trial as GX 213.
[47]   The packet of documents was marked as GX 215 and introduced at trial.

The information referrals accompanying the cover letter contained ones for Judge Hansen and Clerk of Court Perry.[48]   The substance of each of the information referrals was the same. The defendant identified each individual as a "dangerous" taxpayer who had committed violations involving organized crime; false/altered documents; failure to pay taxes; and unreported income. The description of the violations was the same as well and read: "Failed to disclose any contractual obligation. Failed to disclose funds borrowed. Failed to pay taxation on said funds. Failed to return principal to the Lender as directed."

These materials too were routed to an IRS CID special agent working on the criminal investigation of the defendant.

## IV.   SENTENCING COMPUTATION

The government calculates the defendant's advisory sentencing guideline range as follows:

A.      Applying the multiple count grouping rules (U.S.S.G. §§ 3D1.1, 3D1.2), the defendant's offenses of conviction, and associated offense conduct, fall into four separate and distinct groups for the purposes of sentencing guideline calculations:  (i) tax evasion related conduct (Counts 1-3)("Group 1"); (ii) structuring of currency withdrawals and related conduct (Count 4) ("Group 2"); (iii) bank fraud relating to Colorado East and passing fictitious purported U.S. Treasury checks to Colorado East and the El Paso County Court (Counts 5-9) ("Group 3"); and (iv) corruptly interfering with the IRS's administration of the internal revenue laws (Count 10) ("Group 4").   Accordingly, offense level calculations should be done with respect to each of these groups and then the rules concerning multiple groups should be applied. U.S.S.G. §§ 3D1.1,

---

[48]      The defendant also included referrals for Kirk Stewart Samuelson, identified as the Chief Judge of the El Paso County Court; an individual who was employed in the El Paso County Clerk's Office at the time; Dan May, the El Paso County District Attorney at the time, and one of his deputies; and Richard Meyers, identified as the Chief of Police of El Paso County and two of his police officers.

3D1.3.

## Group 1: Tax Evasion (Counts 1-3) : Offense Level Computations.

B.      The base guideline for this group is U.S.S.G. §2T1.1(a), which adopts, for its base

offense level,   the offense level from the tax table set forth in U.S.S.G. §2T4.1 for cases involving

tax losses.   Because the tax loss associated with the offenses of conviction and the defendant's

relevant conduct has been calculated by the government to be approximately $60,598, the base

offense level is **Level 14** (U.S.S.G. §2T4.1(E)(tax loss more than $30,000 but not more than

$80,000)).[49]

C.      Specific   offense   characteristic   U.S.S.G.   §2T1.1(b)(2)   applies,   increasing

defendant's offense score by **2 levels**, because the defendant's tax evasion offense conduct

involved sophisticated means.

D.      There are no victim-related, role-in-offense, or obstruction adjustments which

apply to this group.. U.S.S.G. Parts 3A-3C.

E.      The adjusted offense level for this group would therefore be **16**.

## Group 2: Currency Withdrawal Structuring (Count 4): Offense Level Computations.

F.      The base guideline for this group is U.S.S.G. §2S1.3, which prescribes a base

offense level of 6, plus the number of offense levels from the table in U.S.S.G. §2B1.1

corresponding to the value of the funds involved in the offense conduct .   Based on the value of

the funds involved here ($92,100), 8 levels should be added, U.S.S.G. §2B1.1.(b)(1)(E)(amount

more than $70,000 but not more than $120,000), resulting in a total base offense level of Level **14**.

---

[49]      This loss amount includes tax losses calculated for 2004, as the defendant's failure to file an
individual income tax return for that year and associated conduct constitutes relevant conduct for the purposes of
sentencing guideline calculations. *See* U.S.S.G. § 2T1.1, comment. (n.2).

G.    The government takes the position that specific offense characteristic U.S.S.G. §2S1.3(b)(2) applies, increasing the offense score **2 levels**, because the defendant structured the $92,100 in cash withdrawals as part of a pattern of unlawful activity that involved more than $100,000 in a 12-month period.[50]

H.    There are no victim-related, role-in-offense, or obstruction adjustments which apply to this group. U.S.S.G. Parts 3A-3C.

I.    The adjusted offense level for this group would therefore be **16**.

**Group 3: Bank Fraud & Passing Fictitious U.S. Treasury Checks (Counts 5-9): Offense Level Computations.**

J.    The base guideline for this group is U.S.S.G. §2B1.1.   The base offense level is **7**, pursuant to 2B1.1(a)(1), because of the bank fraud offenses of conviction have a statutory maximum term of imprisonment of 30 years.

K.    Specific offense characteristic U.S.S.G. §2B1.1(b)(1)(G) applies, increasing the offense score **12 levels** for this group, because the applicable intended loss in this case, $305,000, was more than $200,000 but not more than $400,000.

L.    There are no victim-related, role-in-offense, or obstruction adjustments which apply to this group. U.S.S.G. Parts 3A-3C.

---

[50]    As set forth above, during the time that the defendant was structuring the withdrawal of $92,100 in cash from the Skyview RBC brokerage account, he was also writing checks in sub-$10,000 amounts to his relative, RW, which were drawn on this account.   The checks totaled approximately $51,530.   Further, as discussed above, the government's evidence is that the defendant's uncle deposited and then held onto this money for the defendant and gave some of the money back to the defendant in the form of cash several months later.   The government's position is that these transactions with the defendant's uncle were part of an overall pattern of unlawful activity designed to conceal these funds from the IRS.

The $92,100 in cash withdrawals is also part of a pattern of unlawful activity involving more than $100,000, the defendant's structuring of gold cash purchases   is taken into account.   As discussed above, according to RMMCK's testimony, the defendant, with RMMCK's help structured cash purchases of approximately $18,000 in a way that circumvented currency reporting by the gold seller.

M.      The adjusted offense level for this group would therefore be **19**.

**Group 4: Interfering with the Administration of the Internal Revenue Laws (Count 10): Offense Level Computations.**

N.      The government's position is that the base guideline for this group is U.S.S.G. §2J1.2, because the gravamen of the charged conduct was the defendant's campaign to misuse and abuse IRS forms and processes to obstruct and interfere with administration of justice, and gain unwarranted advantage, in the El Paso County criminal misdemeanor cases and the Pueblo County civil case referenced in Count 10 of the superseding indictment, as outlined above. Additionally, there was no actual or intended quantifiable tax loss associated with this particular conduct.   Accordingly, the government's position is that U.S.S.G. §2T1.1., the alternative offense guideline, is inapposite.   Pursuant to §2J1.(a), the base offense level is **14**.

O.      The government takes the position that specific offense characteristic U.S.S.G. §2J1.2(b)(3)(C) applies, increasing the offense score **2 levels** for this group, because the defendant's offense conduct for this group was extensive in scope, planning and preparation.

P.      The government takes the position that U.S.S.G. § 3A1.2(a) applies, increasing defendant's offense score for this group an additional **3 levels**, because targets of this offense conduct were state court judges, state court administrators, and state and local law enforcement officers and the defendant targeted these individuals because of the positions that they held and the actual or perceived connections that these positions had to the state court cases referenced in Count 10 of the superseding indictment.

Q.      There are no other adjustments under U.S.S.G. Parts 3A-3C which would apply to this group.

R.      The adjusted offense level for this group would therefore be **19**.

43

**Multiple Count Adjustment (U.S.S.G. Part 3D).**

S.      Pursuant to Section 3D1.4(a), Groups 3 and 4 correspond to a total of two units because their offense levels are the same and so they are equally serious.   Each having adjusted offense levels of 16, Groups 1 and 2 are each considered 3 levels less serious than Groups. Each corresponds to an additional unit. U.S.S.G. §3D1.4(a).   Because there are a total number of 4 units, adjusted offense level **19** (the offense level shared by Groups 3 and 4) should be increased by **4 levels**, making the final adjusted offense level **23**.

**Total Offense Level.**

T.      The defendant is not eligible to receive an offense level reduction for acceptance of responsibility, pursuant to U.S.S.G. §3E1.1. The resulting offense level would therefore remain **Level 23**.

**<u>Criminal History</u>.**

U.      Based on facts currently known to it, the government believes that the defendant has one prior conviction and prior sentence that would be includable in the calculation of his criminal history category: The defendant's conviction for criminal misdemeanor false reporting in El Paso County, County Court, Fourth Judicial District (Case No. 2006M1224).   As discussed above, the defendant was sentenced to serve a 90-day jail term on this conviction on October 19, 2006.   He served several days of this sentence but then was released on bond pending an appeal of his conviction, the remainder of his jail sentence being held in abeyance pending appeal. As discussed above, the defendant failed to appear for a December 14, 2007 hearing in connection with his completion of the jail sentence, and a "no bond" failure to appear warrant was issued that day for his arrest. This warrant remains outstanding.

V.      The defendant's 90-day jail sentence in the El Paso County criminal misdemeanor

false reporting case results in 2 criminal history points, pursuant to U.S.S.G. §§4A1.1(b), 4A1.2(c)(1).   The defendant is deemed to have been on escape status in this criminal misdemeanor case while engaging in offense conduct in this case. U.S.S.G. §4A1.2(n)(failure to report for service of a sentence of imprisonment shall be treated as an escape from such sentence). Because of this, the defendant, in turn, is considered to have committed offense conduct in this case   while under a criminal justice sentence, warranting 2 additional criminal history point to his criminal history score.[51]

W.     The defendant's countable criminal history thus results in a total of 4 criminal history points, placing him in Criminal History **Category III**.

**Resulting Guideline Ranges**.

X.     The guideline range resulting from the estimated offense level of (T) above, and the (tentative) criminal history category of (W)   above, is **57 to 71 months**.

Y.     Pursuant to guideline §5E1.2, assuming the estimated offense level of (T) above, the fine range for this offense would be   $10,00   to $100,000, plus applicable interest and penalties.

Z.     Pursuant to guideline §5D1.2, if the Court imposes a term of supervised release, that term shall at least two years but not more than five years.

AA.    The Court should order restitution to the IRS in this case as a condition of supervised release, because the IRS is an identifiable victim that has suffered pecuniary loss. U.S.S.G. §5E1.1(a)(2).

---

[51]     The defendant's other criminal misdemeanor conviction, in El Paso County Case No. 05M6119, is excluded from consideration in calculating his criminal history score, as the defendant received a fine and a one year term of probation, which is a term that is under the threshold for including sentences for such offenses. U.S.S.G. §4A1.2(c)(1).

## VI.   GOVERNMENT'S SENTENCING RECOMMENDATION

The foregoing sentencing guideline calculations do not fully and completely take into account all of the defendant's criminal conduct in this case.   Aspects of the defendant's conduct not fully considered under the guideline calculations include the defendant's misuse of DCW's name and SSN in the tax evasion scheme and the potential harm to her; the defendant's structuring of cash purchases of gold to evade business currency reporting requirements; and the defendant's apparent involvement in a tax refund scheme involving the use of false income tax returns (described in the government's first supplemental Fed.R.Evid. Rule 404(b) Notice, Docket Entry 68) that took place during some of the offense conduct in this case.   Further, the defendant has several criminal misdemeanor convictions that were not included in his criminal history score and so not factored into the computation of his advisory sentencing guideline range.

The Court should take each of these things into account as factors in fashioning a sentence in this case and should consider whether a sentence that varies upwardly from the calculated advisory sentencing guideline range is warranted.   The defendant's conduct and criminal history warrant, at the very least, an imprisonment sentence at the upper end of the calculated sentencing guideline range. The Court should also order the defendant, as a special condition of supervised release, to pay restitution to the IRS corresponding to the government's calculated tax losses for the years 2004 through 2007 .

Respectfully submitted,

JOHN F. WALSH
United States Attorney


s/Kenneth M. Harmon
By:   Kenneth M. Harmon
Assistant U.S. Attorney

46

1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Tel. No. (303) 454-0100
Fax No. (303) 454-0402
E-mail: kenneth.harmon@usdoj.gov

## CERTIFICATE OF SERVICE

I hereby certify that on this 24th day of December, 2013, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF.  I further caused to be mailed a copy of the foregoing to the defendant at the following address:

Michael-destry Family of Williams
Reg. No. 39714-013
Federal Detention Center
9595 W. Quincy Avenue
Littleton, CO 80123

s/ Kenneth M. Harmon
KENNETH M. HARMON
Assistant United States Attorney
U.S. Attorney's Office
1225 Seventeenth Street, Suite 700
Denver, Colorado 80202
Tel. No. (303) 454-0100
Fax No. (303) 454-0402
E-mail: kenneth.harmon@usdoj.gov

47